IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| MESH COMM, LLC | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION No. 3:09CV-641-S |
| | ) | |
| v. | ) | |
| | ) | |
| E.ON US LLC; LOUISVILLE GAS | ) | |
| AND ELECTRIC COMPANY; and | ) | |
| TRILLIANT NETWORKS, INC. | ) | |
|     Defendants. | ) | |

**PLAINTIFF MESH COMM, LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................... 1

II.   OVERVIEW OF THE TECHNOLOGY IN THE PATENT-AT-SUIT ........................ 2

III.  APPLICABLE LAW ................................................................................................ 4

IV.   MESH COMM'S PROPOSED CLAIM CONSTRUCTIONS ........................................ 7

      A.    "Network Cluster" ........................................................................................ 8

      B.    "Self-Configuring" ....................................................................................... 9

      C.    "Virtual Node[s]" ....................................................................................... 11

      D.    "Self-Configuration Process"...................................................................... 13

      E.    "Virtual Gate"............................................................................................. 14

      F.    "External Network"..................................................................................... 16

      G.    "Virtual Network Operations Entity …" ..................................................... 17

      H.    "Events"...................................................................................................... 18

V.    CONCLUSION .................................................................................................... 20

Pursuant to the Court's March 15, 2010 Order, Plaintiff Mesh Comm, LLC ("Mesh Comm") submits its Opening Claim Construction Brief, and would show as follows:

## I.   <u>INTRODUCTION</u>

The American Recovery and Reinvestment Act of 2009, popularly known as "the Stimulus Act", included $3.4 billion dollars of grants to fund Smart Energy projects to modernize the United States energy grid.  A central prong of that modernization strategy was support for the installation of "smart meters" by utility companies across the country. . As noted by President Obama:

> [M]ost of the projects that are receiving grants involve the installation of what are known as smart meters -- devices that will have a direct benefit for consumers who want to save money on their electric bills.

Remarks by the President on Recovery Act Funding for Smart Grid Technology (available at http://www.whitehouse.gov/the-press-office/remarks-president-recovery-act-funding-smart-grid-technology). One part of the technology that transforms meters into "smart meters" and energy grids into "smart grids" is at issue in the present case.

In 1998, Kenneth Garrard and Karl Elliot decided to embrace their entrepreneurial spirits and founded Telemetry Technology, Inc. ("TTI"). Mr. Garrard and Mr. Elliott recognized that the current state of the art in sensor reading left much to be desired, and they focused their fledgling company on creating systems that would allow companies to remotely read and manage sensors utilizing multiple methods of communications. This research and development effort finally led to their development of the systems claimed in U.S. Patent No. 7,379,981 ("the '981 patent" attached hereto as Exhibit A).  Eventually, a venture capital firm took over TTI and

Mr. Garrard left. As part of his exit package, Mr. Garrard was given full ownership in the '981 patent, which he assigned to Plaintiff Mesh Comm LLC.

## II.      OVERVIEW OF THE TECHNOLOGY IN THE PATENT-AT-SUIT

The '981 patent teaches technology used in the creation of remote sensor networks, such as those currently being deployed across the United States to allow for the remote reading and control of electric utility meters. To provide for this remote reading and control, meters in modern smart grids, such as those accused of infringement in the present suit, have low powered radios that allow the meters to transmit data wirelessly. Rather than using these radios to directly communicate with computers at the utility company, these meters have the capability to form networks by communicating with each other. The meters can then forward messages between themselves to reach a centralized gateway that will forward messages to the utility company. This interconnection of wireless devices is known in the industry as a mesh network.

Mr. Garrard and Mr. Elliott recognized the benefits of utilizing mesh networks in the utility space, and also recognized the need to minimize the amount of manual involvement in the configuration of these networks. In their patent they recited the need for nodes that can self-configure to provide for ease of configuration and high levels of reliability. That innovation, using self-configuring nodes to form self-configuring, self-healing networks, was prescient. Self-configuring and self-healing became core requirements of smart grids a decade later.

2

## WAN Self-Healing Mesh Networking

When installed, each WAN node automatically establishes links with other WAN nodes and joins the mesh network. The SecureMesh WAN uses wireless mesh technology to extend coverage (modular expansion to bypass obstacles and terrain) and enhance reliability (dynamic routing and self-healing failover to ensure communications). Typically, communications use links established upon deployment, but in case of link degradation, the mesh network provides route diversity and dynamic rerouting to maximize performance. In case of link failure, the network provides self-healing failover to autonomously reroute packets to active alternative paths across the mesh. The network also provides self-healing failover in case of backhaul failure (for instance, a failure of an upstream router), in which case the mesh network autonomously self-heals and reroutes to an alternative backhaul through a different Gateway.

*See* Trilliant, Inc. SecureMesh Product Page (attached hereto as Exhibit B) at 3.

In addition to the self-configuring nodes in the network, the nodes need a path to communicate with the utility company. Thus, Mr. Garrard and Mr. Elliot taught of the use of a virtual gate, which would provide an access point for the nodes to communicate through, and a virtual network operations entity, that allowed for the management of these self-configuring nodes by the utility company.



'981 Patent at Figure 2.

The asserted claims in the '981 include the combination of those three innovative parts. They involve self-configuring wireless networks, which are arranged into network clusters,

consisting of self-configuring virtual nodes. The nodes are able to communicate with virtual

gates and a virtual network operations entity. This combination provides the underpinnings of

modern smart grids being implemented today across the United States.

## III.    APPLICABLE LAW

The scope of a patent is determined by the claims. 35 U.S.C. § 112, ¶ 2; *Burke, Inc. v.*

*Bruno Independent Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Under *Markman v.*

*Westview Instruments, Inc.,* the Court construes the scope and meaning of disputed claim terms

as a matter of law. 517 U.S. 370, 389-90 (1996). Patents are presumed to be written for persons

skilled in the field of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)

(en banc). For that reason, the proper construction of a disputed claim term requires that the term

be interpreted as it would by a skilled artisan at the time of the invention. *Innova/Pure Water,*

*Inc. v. Safari Water Filtration Sys., Inc.* 381 F.3d 1111, 1116 (Fed. Cir. 2004). In determining a

term's proper meaning, "a court looks to those sources available to the public that show what a

person of skill in the art would have understood disputed claim language to mean." *Id.* "Those

sources include 'the words of the claims themselves, the remainder of the specification, the

prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning

of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (quoting *Innova, id.).*

The components of the intrinsic evidence form a natural hierarchy of interpretive guides

and outline a claim construction methodology in which the claims, the patent specification, and

the prosecution history must all be reviewed to reach a proper understanding of the scope of the

disputed claim terms. The claims form the first tier of the hierarchy and can "provide substantial

guidance as to the meaning of particular claim terms" through context and by relation to other

4

claims. *Phillips*, 415 F.3d at 1314-15. The remainder of the specification forms the second tier of

the hierarchy. "[T]he specification is always highly relevant to the claim construction analysis.

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Finally, the third tier of

intrinsic evidence is the prosecution history, which is a record of the proceedings between the

Patent & Trademark Office and the patentee during the application and reexamination process.

The prosecution history, however, "often lacks the clarity of the specification and thus is less

useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

   The Federal Circuit has also sanctioned the use of "extrinsic evidence" in the claim

construction process for the purpose of educating the court about the field of the invention and

the viewpoint of a person of ordinary skill in that field. Extrinsic evidence "consists of all

evidence external to the patent and prosecution history, including expert and inventor testimony,

dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980

(Fed. Cir. 1995); *see also*, *Vitronics*, 90 F.3d at 1584. The Federal Circuit has warned though

against giving extrinsic evidence too much weight in the claim construction analysis. Extrinsic

evidence was not created for the purpose of explaining the meaning of claim terms, may not

reflect the understanding of a person having ordinary skill in the art, and may suffer from a

litigation-inspired bias that is not present in the intrinsic record. *Phillips*, 415 F.3d at 1318.

Accordingly, the use of extrinsic evidence must be tempered against the context provided by the

intrinsic evidence. *Id.*

   While intrinsic and extrinsic evidence are available as tools for construing disputed claim

terms, "the claim construction inquiry...begins and ends in all cases with the actual words of the

claims." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)

5

(citations omitted). Although the specification informs the meaning of claim terms, it does not change those meanings unless the patentee has chosen to be his own lexicographer by clearly setting out his intended meaning either expressly or by implication. *See Phillips*, 415 F.3d at 1321; *Vitronics*, 80 F.3d at 1582. A corollary pitfall to be avoided when interpreting claim terms in the context of the specification is importing limitations from the specification into the claims. *See Phillips,* 415 F.3d at 1323 ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification" (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)).

The challenges associated with construing claims have generated several claim construction "canons" and rules. One such rule is that although the specification includes a very detailed example of the inventor's preferred method of practicing the invention, known as the "preferred embodiment," the claims are not often limited to the same scope as the example. *Phillips*, 415 F.3d at 1323. A corollary canon of construction is that while not limited to the same scope as the preferred embodiment, claim terms are presumed to encompass the preferred embodiment. A construction of the claim terms that excludes the preferred embodiment "is rarely, if ever, correct, and would require highly persuasive evidentiary support." *Vitronics*, 80 F.3d at 1583. These two rules of construction in combination simply mean that claims should generally be construed broadly enough to capture the preferred embodiment, and should not be construed so narrowly that they capture only that embodiment.

Although multiple rules may come into play when construing claims, the goal of each is the same: claims should be interpreted as they would be understood by a person of ordinary skill in the field of the invention at the time the patent application was filed. In some cases, claim construction "involves little more than the application of the widely accepted meaning of

commonly understood words." *Id.* at 1314. In others, by always striving to understand the terms from the view of a person skilled in the art, a court will arrive at the correct construction. While the process may be challenging, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw*, 158 F.3d at 1250. The goal of claim construction is to simplify issues for the trier of fact.


IV.    **MESH COMM'S PROPOSED CLAIM CONSTRUCTIONS**

       The Parties dispute which terms need to be construed by the Court. Mr. Elliott and Mr. Garrard utilized many terms that were well known in the field of art and gave these terms their usual and customary meaning. Accordingly, Mesh Comm disagrees with Defendants' position regarding the need for the Court to construe several of the terms Defendants propose. In each of these cases, Mesh Comm asks the Court to refuse to apply any special or uncommon meaning and simply adopt the meaning that is ordinary and customary to one skilled in the art. *See* Declaration of Mr. Frank Koperda ("Koperda Decl." attached hereto as Exhibit C), at 26.

       After discounting these unnecessary terms, there are seven (7) terms that Mesh Comm believes should be construed -- all but one of which can be found in independent Claim 1 of the '981 Patent (as well as in a number of dependent claims). For the convenience of the Court, Claims 1 is reprinted:

       1. A self-configuring wireless network, comprising:
              (I) a network cluster, comprising:
                     (a) a first network including a plurality of self-configuring, individually addressable virtual nodes in which individual virtual nodes are independently operative to (i) initiate and establish a wireless communication connection with any other self-configuring virtual node associated with the first network during a self-configuration process, (ii) store information regarding the

7

identities and/or location of other self-configuring virtual nodes with which the node has established a communication connection, (iii) generate data and transmit the data to other virtual nodes with which the node has established a communication connection, and (iv) receive data from virtual nodes and forward the data to other virtual nodes with which the node has established a communication connection;

(b) a second network including a plurality of self-configuring, individually addressable virtual nodes in which individual virtual nodes are independently enabled with the capabilities to (i) initiate and establish a wireless communication connection with any other self-configuring virtual node associated with the second network during a self-configuration process, (ii) store information regarding the identities and/or location of other self-configuring virtual nodes with which the node has established a communication connection, (iii) generate data and transmit the data to other virtual nodes with which the node has established a communication connection, and (iv) receive data from virtual nodes and forward the data to other virtual nodes with which the node has established a communication connection;

(c) wherein the first network communicates with the second network via a wireless communication connection between at least virtual node associated with the first network and at least one virtual node associated with the second network;

(II) a virtual gate being communicatively coupled to the first and/or second network and configured to provide a communication access point between the network cluster and at least one external network; and

(III) a virtual network operations entity configured to facilitate communications between the network cluster, and at the least one external network.

A.    **"Network Cluster"**

| 1. A self-configuring wireless network, comprising: (I) a **network cluster** . . . . | A network Cluster contains at least two networks where each network contains at least two virtual nodes |
|---|---|

The term "network cluster" is used in the specification to describe connected networks. One detailed example is found in Figure 3. The specification explains how they are connected.

8

First, "a first network 34 may be connected to a first VGATE 22 and a second network 33 may be connected to the first network . . . ." '981 Patent, 8:13-15. Those two networks, 34 and 33, would be sufficient to form a "network cluster" since "at least two networks 31-37 may be daisy chained together to form a network cluster . . . ." '981 Patent, 8:5-7.

The specification then elaborates on this, stating that "networks 31-38 need not create a daisy chain path . . . ." '981 Patent, 8:23-25. It then gives an example, again referring to Figure 3, stating that "a network 38 may communicate to a VGATE 22 through a network 35 . . . ." '981 Patent, 8:25-28. The specification then goes further, giving another example using the same figure where "network 37 may form a direct path to VGATE 22 through vnode 30g . . . ." '981 Patent, 8:29-34.

Because no other limitations are required by the intrinsic evidence, we propose a construction that describes what one of skill in the art would understand the term to mean. One with ordinary skill in the art at the time of the invention would ordinarily understand that a network requires at least two devices to communicate with each other.  Thus, each network in the 'cluster network' contain at least two virtual nodes (Vnodes). *See* Koperda Decl. [Ex. C], at 20.


B.      **"Self-Configuring"**

| (a) a first network including a plurality of **self-configuring**, individually addressable virtual nodes . . . . | the ability to configure the wireless communications parameters and the routing configuration parameters without the need for manual intervention |
|---|---|

9

The term "self-configuring" is used throughout the '981 Patent in the above context, describing virtual nodes. The disclosed embodiments for the networks formed by these nodes define some minimal scope for "self-configuring." Perhaps more importantly, the '981 Patent's description of the self-configuring process shows what is not part of the intended meaning. In communications with the USPTO, Patentee described self-configuring as "capable of self-initiating . . . to establish connectivity and form a network . . . ." Amendments to Application for '981 Patent filed Dec. 28, 2005 ("Amendments, Dec. 28, 2005" attached hereto as Exhibit D"), at 17,. That capability is distinguished from the prior art, in which "wired access points  . . . of the established network initiate the attachment of potential nodes." Amendments, Dec. 28, 2005, at 18. Later, self-configuring was described as being able to "self-initiate a rules-based process to establish connectivity and form a network . . . ." Amendments to Application for '981 Patent filed Aug. 29, 2007 ("Amendments, Aug. 29, 2007" attached hereto as Exhibit E), at 22. More basically, it means "the nodes configuring themselves." *Id.*

According to the specification, Figure 2 "schematically depicts an embodiment" of a wireless network configured by these nodes. '981 Patent, 4:63-65. That network, marked as 20, is comprised of a number of vnodes and a vgate communicating wirelessly. '981 Patent, 4:65-5:1. One embodiment of a self-configured network includes "[a] layer for *configuring* the network."'981 Patent, 5:4-6 (emphasis added). That layer is described in the specification by its use, "to establish and support connections between the various vnodes 23 to VGATE 22." '981 Patent, 5:6-8. That is in addition to what "may be present in a particular wireless communication transport agent . . . ." '981 Patent, 5:13-15. Using an example pulled from the specification, Bluetooth, that would include parameters like a channel, since it must have the "units sharing a common channel." '981 Patent, 5:1-3.

10

To establish connectivity and form a network, self-configuring nodes must be able to establish (configure) the parameters correctly. Koperda Decl. [Ex. C], at 20. In one disclosed embodiment the network these self-configuring nodes form includes routing using the Internet Protocol (IP) to a virtual gate. '981 Patent, 5:59-62; Koperda Decl. [Ex. C], at 20. Establishing an IP route relies on having already established a connectivity of a different sort. Koperda Decl. [Ex. C], at 20. Thus, the parameters must have been established.

Self-Configuring, however, does not mean that the nodes must act entirely alone. The vnodes participate with each together and a vgate to configure these parameters. The specification describes the process as involving multiple vnodes and at least one vgate. '981 Patent, 10:52-11:4. Configuring the parameters involves broadcasting requests and waiting for responses. *Id.* The different entities act in concert to configure the required parameters and form the network. The nodes do not, however, require manual intervention – they are self-initiating. '981 Patent, Claim 1(I)(a)(i).

Since the virtual nodes, as described in the specification, do not require manual intervention and do require the capabilities described above, the construction proposed above would be proper.

C.    **"Virtual Node[s]"**

| (a) a first network including a plurality of self-configuring, individually addressable **virtual nodes** . . . . | a logical point in a network which can create, transmit, receive and route a message |
|---|---|

11

The Claim language excerpted above describes a network as a set of self-configuring virtual nodes. Based on the claim language itself and the specification that elucidates its meaning, Mesh Comm proposes that the term "virtual nodes" highlighted above be understood as "logical point[s] in a network which can create, transmit, receive and route a message." The specification teaches that a network may be comprised of multiple layers. Specifically, it includes an embodiment of the invention that comprises a number of layers. '981 Patent, 5:4-5. In the example given, there is one layer for "configuring the network," one for "upstream communications," and one for "downstream communications," all in addition to the wireless communication transport agent's layers. '981 Patent, 5:4-15. So, because they can act as a part of that network, "virtual nodes" must encompass the abilities to transmit and receive messages. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). ("[T]he specification is always highly relevant to the claim construction analysis.")

The specification goes on to explicitly state some capabilities of virtual nodes. It teaches that they "can be originators, recipients or routers of data." '981 Patent, 5:58-59. Also, they can be used as intermediate hops between other vnodes and a gateway. '981 Patent, 6:9. Thus, according to the specification, the term must encompass the capability to create, transmit, receive, and route.

Mr. Koperda reasons through this result in his declaration. He explains why these capabilities are required. Koperda Decl. [Ex. C], at 22. First, the virtual nodes must be able to self-configure as per the claim. *Id.* To do that the nodes must be able to transmit and receive. *Id.* Second, the nodes must also be able to relay messages from other nodes to a virtual gate. *Id.* Since the specification describes embodiments that use routing to achieve that result, virtual

12

nodes must be able to route. *Id.* Last, the nodes must be able to create a message to transmit data read from the meter. *Id.*

That same understanding is required by the File History. There, in describing the differences between some disclosed embodiments and the prior art, the patentee states that "virtual nodes are configured to be originators of data, recipients of data, and routers of data . . . ." Amendments, Aug. 29, 2007 [Ex. E], at 21. This statement demonstrates the understanding that the patent office and the patentee came to, and echoes the understanding required by the specification.

The proposed construction interprets virtual as logical because inherently, virtual means not physical. *See* Koperda Decl. [Ex. C], at 18. The concept of a virtual node is an abstraction: the physical implementation is a separate thing, relied on but logically divorced from it. This is necessary to describe a thing with so many possible embodiments. This understanding is supported by examining how other similar terms were defined at the time. One example is from the *Microsoft Computer Dictionary*, which defined a "virtual circuit" as one that "appeared to be a direct link" but was not. *Microsoft Computer Dictionary*, 470 (4th ed. 1999) (attached hereto as Exhibit F). That same understanding of the difference between what is physically true, or "real," and what is logically true is central here.

D.      **"Self-Configuration Process"**

| (a) . . . individual virtual nodes are independently operative to (i) initiate and establish a wireless communication connection | The process of configuring the wireless communications parameters and the routing configuration parameters without the need for |
| --- | --- |

| | |
|---|---|
| with any other self-configuring virtual node associated with the first network during a **self-configuration process** . . . . | manual intervention |

A person of skill in the art's understanding of the term "self-configuration process" would be inextricably linked to the meaning of self-configuration. As the specification describes it, the "self-configuration process" is just the process of "self-configuring" that virtual nodes self-initiate. See '981 Patent, 10:52-11:40. In fact, the specification refers to "an example of self-configuration," then steps through an example process, and then describes the process as a "self-configuration process." '981 Patent, 10:52-53, 11:41-42. Just as self-configuration must be understood to include the capacity to configure the basic communications without manual intervention, "self-configuration process" must as well. Koperda Decl. [Ex. C], at 21.

E.     **"Virtual Gate"**

| | |
|---|---|
| (II) a **virtual gate** being communicatively coupled to the first and/or second network and configured to provide a communication access point between the network cluster and at least one external network; | a logical gateway that enables communications between a Vnode and an external network |

A "virtual gate" would be known to enable communications by one skilled in the art because of the embodiments disclosed in the specification. In one disclosed embodiment, a

14

"virtual gate" may be "a computer gateway that enables communications between public or private computer networks 26 and network 20" '981 Patent, 5:62-65 (discussing figure 2). It may also act as an administrator for that network. '981 Patent, 7:15-18. In the illustrated embodiment, it is a "gateway that enables wireless network 20 to communicate with a private computer network or a public computer network such as the Internet." '981 Patent, 7:18-21. In another disclosed embodiment a "virtual gate" comprises a "standard computer gateway," which does not administer the attached network. '981 Patent, 7:21-23. Functionally it can "receive information" and "retransmit that information" in both directions between networks connected through it. '981 Patent, 7:28:35. Thus, it enables communication.

The proposed construction names a "virtual gateway" as a logical one because inherently, virtual means not physical. Koperda Decl. [Ex. C], at 18. The "standard computer gateway" mentioned above is just the physical manifestation of this logical structure. Koperda Decl. [Ex. C], at 18, 23. As is shown by the multiple and disparate embodiments detailed in the specification, the physical implementation is secondary to its use as a logical structure in this invention.

As the claim excepted above indicates, the term "virtual gate" cannot be limited to connect only one network to some external network or networks. See Koperda Decl. [Ex. C], at 23. Specifically, "and/or" precludes such a construction. Additionally, the term must be broad enough to encompass connecting a "network cluster and at least one external network." '981 Patent, Claim 1. Not only does the Claim demand it, the specification does as well when it describes a network cluster communicating through a "virtual gate." See '981 Patent, 8:13-23.

15

F.      **"External Network"**

| (II) a virtual gate being communicatively coupled to the first and/or second network and configured to provide a communication access point between the network cluster and at least one **external network**; | a network separate from the network cluster |
| --- | --- |

Figure 2 demonstrates the meaning of this term in one embodiment of the invention. In the figure, 22 indicates the VGATE, which is also labeled. It is connected to a first network, 20, as stated by the specification. '981 Patent, 8:35-40. Network 20 is, per the specification, connected to VNOC 25. '981 Patent, Figure 2. Thus, a first network, 20, connected to an external network, depicted as separate.

The meaning is more accurately shown by Figure 3. In Figure 3 the network cluster is labeled and also numbered as 39. '981 Patent, Figure 3. Again, in one embodiment, a first network, 34, is connected to a VGATE, 22. '981 Patent, 8:13-16. VGATE 22 is also connected to a network 37 through vnode 30g. '981 Patent, 8:5-12. Thus, in the embodiment demonstrated in Figure 3 the VGATE 22, connected to a network 34, connects the network cluster to an external network, 37. Network 37 is separate from the network cluster, but has no further limitations.

16

G.     **"Virtual Network Operations Entity …"**

| (III) a **virtual network operations entity configured to facilitate communications** between the network cluster, and at the least one external network. | a device or group of devices that provide network operation management of the network cluster and receive data from members of the network cluster and send data to the members of the network cluster |
| --- | --- |

The "virtual network operations entity configured to facilitate communications" both transmits and receives between the network cluster and at least one external network. As set forth in Mr. Koperda's Declaration, the virtual network operations entity is a reference to the VNOC referred to in the specification. Koperda Decl. [Ex. C], at 25 Thus, construction must focus how a VNOC as described in the specification would be understood by one of ordinary skill in the art at the time.

First, someone of skill in the art would understand that this term is not limited to one device. In the specification, Figure 9 illustrates one example embodiment. '981 Patent, 13:4-6. As the specification states, the "various third party network services may communicate with various I/O devices." '981 Patent, 13:41-42. The figure merely illustrates a VNOC connected to various services. *See* '981 Patent, Figure 9. Moreover, Mr. Koperda states is his declaration that one skilled in the art would know that is at least some implementations of a NOC "there would be many different communicating devices and gateways." Koperda Decl. [Ex. C], at 24. Thus,

17

one of skill in the art would understand that this term could encompass one or more physical devices.

Second, the term would not be understood as limited to implementations with a universal communication adapter. Though the specification does discuss an embodiment with a universal communication adapter and use it as an example, the term cannot be limited to just that embodiment. '981 Patent, 8:56-9:28; *see Phillips*, 415 F.3d at 1323. As the specification states, that is only "according to one embodiment." '981 Patent, 8:64-67.

Last, one skilled in the art would need to understand what it is to "facilitate communications." As Mr. Koperda explains in his declaration, one of skill in the arts would know that VNOCs "normally have the ability to control and monitor the communications between the various network elements and take corrective action." Koperda Decl. [Ex. C], at 24. The specification demonstrates this capability when describing automated reactions to "pre-specified events," discussed below. In the example given the VNOC can shutdown a device in response to a safety reading being exceeded. '981 Patent, 14:4-10.

Given these requirements taken from the specification, Mesh Comm's proposed construction is proper, while a more limiting construction could not be.

H.    **"Events"**

| 11. The self-configuring wireless network of claim 1, wherein the virtual network operations entity comprises: a communication interface configured to accommodate a plurality of | Occurrences (or the lack of an occurrence) selected for monitoring |
| --- | --- |

18

| | |
|---|---|
| communication protocols employed during communications between the network cluster and the at least one external network; an event naming module configured to identify pre-specified **events**; an event database configured to store information regarding the pre-specified **events**; an event management module configured to process and manage occurrences of the pre-specified **events**; and a communication management module configured to manage communication of the pre-specified **events** between the network cluster and the at least one external network. | |

The specification is very clear, "events correspond to occurrences (or the lack of an occurrence)." '981 Patent, 13:60-62. Since the patentee may be their own lexographer when their intent is as clear as it is here, it is the rest of the term that need be construed. *See Phillips*, 415 F.3d at 1321. What pre-specified refers to is, unfortunately, less clear. How it additionally limits the term must be taken from what a person of ordinary skill would understand from the specification.

Read in context, as above, the term "pre-specified events" is inherently linked to the functioning of "virtual network operations entity." After defining events, the specification goes on to describe how, in one embodiment, a VNOC could allow "management of customer

19

subscription to, and network publication of events" '981 Patent, 14:24-26. It describes events that are outgoing to the customer interface as "situations for which the customer desires to be notified." '981 Patent, 13:54-64.

Events, however, can be originated from the network *or* the customer interface. '981 Patent, 13:56-58. There must, then, be events the customer does not require notification of, since the customer was the originator. This logical conclusion is further supported by the specification, which states that"[f]or *certain* events a customer may desire notification." '981 Patent, 14:4 (emphasis added). But, others may, for example, "cause an automatic response." '981 Patent, 14:7-10. Thus, customers do not necessarily desire notification of every event, but only certain ones and other events may be monitored and acted upon in other ways.

Based on this intrinsic evidence of the term's meaning, "pre-specified events" should be construed as suggested above. The clear statement of events' meaning combined with the further description of the events in question clearly establish not only the patentee's meaning, but what one of ordinary skill would have understood the term to mean.


**V.    CONCLUSION**

The Defendants ask the Court to adopt claim constructions that do not comport with the ordinary and customary meanings of the claims, that contradict the specification and the prosecution history of the '981 Patent and that improperly limit or broaden the scope of the claims. In contrast, Plaintiff Mesh Comm proposes constructions based on the fundamental tenets of claim construction. Plaintiff therefore respectfully requests the Court adopt its proposed claim constructions.

_September 7,  2010_____                            _/s/Douglas L. Bridges_____

Date                                      John E. Spainhour
                                          john@gsatty.net
                                          **GIVHAN & SPAINHOUR, PSC**
                                          Suite One, Professional Building
                                          200 South Buckman Street
                                          Shepherdsville, Kentucky 40165

                                          Douglas L. Bridges
                                          dbridges@hgdlawfirm.com
                                          **HENINGER GARRISON DAVIS, LLC**
                                          1 Glenlake Parkway, Suite 700
                                          Atlanta, GA 30328
                                          Tel: 678-638-6309
                                          Fax: 678-638-6201

                                          Timothy C. Davis
                                          AL Bar No.: ASB-6834-D63T
                                          tdavis@hgdlawfirm.com
                                          W. Lewis Garrison
                                          AL Bar No.: ASB-3591-N74W
                                          wlgarrison@hgdlawfirm.com
                                          **HENINGER GARRISON DAVIS, LLC**
                                          2224 1ST Avenue North
                                          Birmingham, AL 35203

                                          John W. Olivo, Jr.
                                          NY Bar No.: JO-3382
                                          John F. Ward
                                          NY Bar No.: JW-8012
                                          wardj@wardolivo.com
                                          **WARD & OLIVO**
                                          380 Madison Ave.
                                          New York, NY 10017
                                          Tel:    212-697-6262
                                           Fax:   212-972-5866

                                          **ATTORNEYS FOR PLAINTIFF**

                                          **MESH COMM LLC**

21

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this date, September 7, 2010, I served the foregoing on *All Counsel of Record* by filing the above with the Court's ECF system.

Dated: September 7, 2010                 **RESPECTFULLY SUBMITTED**

                               /s/Douglas L. Bridges
Douglas L. Bridges
dbridges@hgdlawfirm.com
**HENINGER GARRISON DAVIS, LLC**
1 Glenlake Parkway, Suite 700
Atlanta, GA 30328
Tel: 678-638-6309
Fax: 678-638-6201

22